IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

NORBERTO MEDINA-RODRÍGUEZ,

**Plaintiff**,

**v.**                            **Civil No.** 19-1236 (FAB)

$3,072,266.59 IN UNITED STATES
CURRENCY, *et al.*,

**Defendants.**

OPINION AND ORDER

BESOSA, District Judge.

Claimants Foreign Exchange Bank Corporation ("Foreign Exchange Bank"), Guillermo Guiñazú ("Guiñazú"), and José ManuelO Guiñazú (collectively, "claimants") move to dismiss the verified amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Docket No. 28.) For the reasons set forth below, the motion to dismiss is **DENIED**.

I.   **Background**

The United States seeks to appropriate $5,066,920.26 from three brokerage accounts, asserting that this property is subject to civil forfeiture. (Docket No. 1.) According to the United States, Guiñazú committed wire fraud and laundered money on behalf of clients in "high risk" jurisdictions. Id. at p. 2. Commission of the wire fraud and money laundering offenses required access to

the "U.S. financial system," a "critical [component] of [Guiñazú's] business model." Id. at pp. 2—3.  By submitting false information to correspondent financial institutions, Guiñazú and his former wife, Amelia Shuford ("Shuford"), channeled funds from client accounts to the United States through the Federal Reserve Bank.[1]

**A.   Federal Reserve Banks, Master Accounts and Fedwire**

Congress enacted the Federal Reserve Act in 1913 to "provide for the establishment of Federal Reserve Banks, to furnish an elastic currency, and to afford means of discounting commercial paper to establish a more effective supervision of banking in the United States."  63 P.L. 43, 38 Stat. 261 (1913); see TNB USA Inc. v. FRB of N.Y., Case No. 18-7978, 2020 U.S. Dist. 62676 at *1-2 (S.D.N.Y. Mar. 25, 2020) ("The Federal Reserve System is the Nation's central bank.  It consists of twelve Federal Reserve banks across the country.").[2]  Federal Reserve Banks "[conduct] the nation's monetary policy" and "[provide] certain financial services to depository institutions."  Federal Reserve System

---

[1] A correspondent financial institution, also referred to as a "correspondent banking relationship," "[m]eans any formal banking or business relationship established by a bank to provide regular services, dealings, and other financial transactions." 31 C.F.R. §§ 1010.605(c) and (d).  Essentially, a correspondent bank "holds one or more correspondent accounts for a member bank for the deposit or placement of funds."  Correspondent Accounts, 3 Banking Law § 78.11 (2020).

[2] The Federal Reserve Bank of New York is responsible for "all of New York, Puerto Rico, the United States Virgin Islands, and parts of New Jersey and Connecticut."  Fasano v. FRB, 457 F.3d 274, 278 (3d Cir. 2006).

Publication, <u>Roles   and   Responsibilities   of   Federal   Reserve   Directors</u>, p. 17 (available at https://www.federalreserve.gov/publ ications.htm.) (last visited July 9, 2020); <u>see</u> 12 U.S.C. § 225.

The Federal Reserve Wire Transfer Network ("Fedwire") is a financial service offered by the Federal Reserve Bank, "a nationwide electronic network linking approximately 7,000 depository financial institutions (banks) throughout the United States . . . through which trillions of dollars are transferred each day." <u>Fund Transfers Made Through Fedwire Funds Service</u>, 1 The Law of Electronic Transfers § 3.04 (2019); <u>see</u> 12 C.F.R. § 210.26 (defining Fedwire as "the funds transfer system owned and operated by the Federal Reserve Banks . . . for the transmission and settlement of payment offers").

Consumer banks utilize Fedwire to transfer funds from one master account to another pursuant to a volume-based pricing structure.[3]  "A master account is, put simply, a bank account for banks.  It gives the depository institutions access to the Federal Reserve System's services, including its electronic payments system." <u>Fourth Corner Credit Union v. FRB</u>, 861 F.3d 1052, 1053 (10th Cir. 2017); <u>see</u> 31 C.F.R. § 240.2 ("Master Account means the

---

[3]  The Federal Reserve Bank charges, among other costs, a $95 monthly participation fee to transmit funds *via* Fedwire.  <u>See</u> Fedwire Funds Service 2020 Fee Schedules (available at https://www.frbservices.org/resources/fees/wir e-2020.htlm) (last visited July 9, 2020).

record of financial rights and obligations of an account holder at
the Federal Reserve Bank with respect to each other, where opening,
intraday, and closing balances are determined."). Fedwire is
available only to "consumer banks with an account at a Federal
Reserve Bank." Organization JD Ltda. v. United States DOJ, Case
No. 92-3690, 1996 U.S. Dist. LEXIS 4347 at *4 (E.D.N.Y. Apr. 2,
1996). Generally, wire transfers "are conducted through banks on
their own behalf or on the behalf of other financial service
institutions and corporate and consumer bank customers." High
Risk Activity, 2 Compliance Officers Mgmt. Manual § 24.24 (2020).

**B.    The Relevant Parties and Financial Institutions**[4]

Guiñazú is the president and majority shareholder of MCS
International Bank Inc. ("MCS") and Foreign Exchange Bank,
exercising "complete, unfettered control over" both organizations.
(Docket No. 18 at p. 5.) Shuford served on the board of directors
at both institutions. Id. at p. 6.

MCS is an international financial services entity
("IFSE") incorporated in the U.S. Virgin Islands and regulated by
the Office of the Lieutenant Governor, Division of Banking and

---

[4] The Court accepts the following facts as true, as pled in the verified amended
complaint. Assured Guar. Corp. v. García-Padilla, 214 F. Supp. 3d 117, 122
(D.P.R. 2016) (Besosa, J.) (when analyzing 12(b)(6) motions, "the Court accepts
a complaint's well-pled facts as true and views them – and the inferences drawn
from them – in a light most favorable to the pleader").

Insurance.  Id. at p. 5.[5]  Foreign Exchange Bank is an international financial entity ("IFE"), incorporated in Puerto Rico and regulated by the Office of the Commissioner of Financial Institutions.  Id.[6]  Neither MCS nor Foreign Exchange Bank "had a master account at a Federal Reserve Bank [or could send] wire transfers without using a correspondent bank account."  Id.

Cooperative A is a financial institution in San Juan, Puerto Rico, a master account holder with access to Fedwire.  Id. at p. 6.  Financial Institution #1 is located in North Carolina, "had a master account at a Federal Reserve Bank, and could send and receive wire transfers."  Id. at p. 6. Financial Institution #2 is located in the U.S. Virgin Islands.  Id. at p. 7.  Unlike Cooperative A and Financial Institution #1, Financial Institution #2 "did not have a master account at a Federal Reserve Bank."  Id.

---

[5] An IFSE is "any person, other than an individual, incorporated or organized under the laws of the Virgin Islands, the United States, or a foreign country, or a unit of such person, to which a license has been issued . . . [including] international banking entities licensed before December 14, 2016."  V.I. Code tit. 9, § 716 (2019).

[6] An IFE is "any person, other than an individual, incorporated or organized under the laws of Puerto Rico, the United States, or a foreign country, or a unit of such person, to which a license has been issued pursuant to Section 8 of "the International Financial Center Regulatory Act ("Act 273")]."  P.R. Laws Ann. tit 7, § 3081.  Act 273 sets forth incentives to conduct business in Puerto Rico, such as a municipal license tax exemption for duly licensed IFE's.  Id. § 3101.

### C.   MCS Transferred Client Funds from Foreign Countries to the United States

Guiñazú opened a correspondent bank account at Financial Institution #2 and Cooperative A on behalf of MCS in 2015 and 2016, respectively. Id at p. 7. During the application process, Guiñazú submitted false statements to Cooperative A "as part of a fraudulent scheme." Id. at pp. 7–8. For instance, he falsely claimed that Person #1 served as the chief compliance officer for MCS. Id. at p. 8.[7] Cooperative A approved Guiñazú and Shuford's account application based on this misrepresentation. Id.

Clients transferred funds to the MCS operational account. Id. To wire funds elsewhere, clients "contact[ed] MCS, not Cooperative A, with wire instructions." Id. Subsequently, MCS instructed Cooperative A to perform the wire transfer. Id. By acting as an intermediary between MCS and Cooperative A, Guiñazú and Shuford concealed the source of client funds and "limited potential scrutiny" regarding Bank Secrecy Act and anti-money laundering regulations. Id. From September 2017 to August 2017, MCS deposited $38,941,928.53 and withdrew $36,630,117.96 from the Cooperative A account. Id. at p. 9. Cooperative A wired

---

[7] The Bank Secrecy Act ("BSA") requires financial institutions to implement anti-money laundering programs, including the issuance of "certain reports" relevant to "criminal, tax, or regulatory investigations or proceedings." 31 U.S.C. § 5311. Pursuant to the BSA and appurtenant regulations, banks must "[d]esignate an individual or individuals responsible for coordinating and monitoring day-to-day compliance." Cal. Pack. Bank v. FDIC, 885 F.3d 560, 578 (9th Cir. 2018) (quoting 12 C.F.R. § 326.8(c)(3)).

approximately $13,683,527.46 to Switzerland, Argentina, Bolivia, Panamá, the Dominican Republic, Canada, Great Britain, México, Malaysia, Perú, Uruguay, Spain and businesses "owned or affiliated with other members of Guiñazú's family" on behalf of MCS. Id. But for the fraudulent scheme "to obtain the MCS Operational Account at Cooperative A, Guiñazú and MCS could not have reliably engaged in its business, which consisted of executing a large volume of wire transfers." Id.

### D.   Diversion of "Illicit Proceeds"

Guiñazú diverted funds from the Cooperative A account to satisfy membership and wire-transfer fees, constituting "illicit proceeds of wire fraud." Id. at p. 10. The United States alleges that "Guiñazú siphoned a total of approximately $6,732,403.37." Id. at p. 10. He then transferred approximately $1,400,000.00 from the Cooperative A account to Financial Institution #2 "to pay personal and MCS expenses." Id.

Guiñazú, Shuford and MCS opened E*Trade Accounts #1, #2, and #3 between 2014 and 2017. Id. at p. 11. E*Trade, a securities brokerage firm, "was required to comply with the BSA, had a master account at a Federal Reserve Bank, and could send and receive wire transfers." (Docket No. 18 at p. 6.) An E*Trade representative requested that Guiñazú and Shuford provide a "corporate resolution" "signed by all the directors indicating it is okay for

MCS to enter into a fee based professionally managed account relationship." Id. Guiñazú and Shuford submitted a corporate resolution that "was false, inaccurate, and misleading in several ways," i.e. stating that Person #1 served as the chief compliance officer and representing "that MCS was regulated by the Federal Reserve Bank." Id. E*Trade Accounts #1 and #2 "commingled Guiñazú's personal funds, MCS and [Foreign Exchange Bank] capital, illicit proceeds obtained from defrauding E*Trade and Cooperative A, and MCS client funds." Id. at p. 13. The dividends, interest, and capital gains acquired from the E*Trade accounts "[paid] MCS expenses." Id.

Cooperative A closed the MCS account on August 14, 2017, depriving Guiñazú and Shuford of "a reliable way to wire [client funds]." Id. at p. 14. On this same day, Shuford opened an account on behalf of Foreign Exchange Bank at Financial Institution #1. Id. Foreign Exchange Bank "would be taking over for MCS's business and clientele," transitioning operations from the U.S. Virgin Islands to Puerto Rico. Id. Subsequently, the Foreign Exchange Bank account at Financial Institution #1 received $2,233,378.53 in wire transfers from the MCS administrative account at Financial Institution #2. Id. These transactions were "suspicious" because they "lacked an apparent business purpose." Id. at p. 15. Financial Institution #1 requested that Foreign

Exchange Bank disclose its BSA and anti-money laundering compliance policies, account statements and identification of its beneficial owners." Id. Foreign Exchange Bank purportedly presented false information, including the misrepresentation that it held a master account at a Federal Reserve Bank. Id. Financial Institution #1 closed the Foreign Exchange Bank account on August 25, 2017, issuing Shuford a check in the amount of $2,233,478.53. Id. Guiñazú attempted to deposit the check in the MCS account at E*Trade, but was informed that the instrument "had to be payable to MCS." Id. Consequently, Guiñazú changed the E*Trade account holder from MCS to Foreign Exchange Bank by "falsely suggesting that [they] were the same, as opposed to legally distinct, entities." Id. at p. 16. Four days later, Shuford "deposited [the check] in E*Trade account #2." Id. Of this amount, $80,873.71 financed MCS credit card payments, legal fees, payroll and rent. Id.

### E.   Seizure of the E*Trade Accounts

The United States applied for warrants to seize all funds and securities in E*Trade accounts #1, #2 and #3, an amount totaling $5,066,920.26 ("miscellaneous dockets"). See In re Sealed Proceedings, Misc. Nos. 18-MJ-474, 18-MJ-475, 18-MJ-476. Magistrate Judge Bruce J. McGiverin approved the applications on March 20, 2018. Id. Shortly after the seizure, Guiñazú attempted

to review his portfolio online.  (Docket No. 24, Ex. 7.)  E*Trade
denied access, however, stating that the accounts were "closed."
Id.  The miscellaneous dockets remain sealed until further order
of this Court.   The United States has not filed a criminal
complaint, nor has the grand jury returned an indictment concerning
the alleged wire fraud and money laundering violations.

        A year after federal law enforcement officers executed
the seizure warrants, the United States commenced this action
pursuant to the Civil Asset Forfeiture Reform Act of 2000
("CAFRA"), 18 U.S.C. sections 981 et seq.  (Docket No. 3.)  The
Court granted the United States' motions to delay notice and
publication on June 11, 2019 and September 6, 2019.  (Docket Nos. 8
and 12.)   On October 9, 2019, the United States amended the
verified complaint, sending "direct notice by Certified Mail to
all three known potential claimants in this action."  (Docket
No. 19.)  Subsequently, Foreign Exchange Bank, Guiñazú, and José
Manual Guiñazú asserted an interest in the E*Trade accounts
pursuant to Supplemental Rule for Admiralty or Maritime Claims &
Asset Forfeiture Actions G ("Supplemental Rule G").  (Docket No.
24.)[8]  The claimants move to dismiss the verified amended

---

[8] See 18 U.S.C. § 983(a)(4)(A) ("In any case in which the Government files in
the appropriate United States district court a complaint for forfeiture of
property, any person claiming an interest in the seized property may file a
claim asserting such person's interest in the property in the manner set forth
in the Supplemental Rules for Certain Admiralty and Maritime Claims.").

complaint.  (Docket No. 28.)  The United States responded, and the claimants replied.  (Docket Nos. 34 and 39.)

## II.  Standing

As a preliminary matter, Guiñazú, Foreign Exchange Bank, and José Manuel Guiñazú must demonstrate that they have standing to intervene in this action. Supp. R. Admin. or Mar. Cl. & Asset Forfeiture Actions G(8); United States v Cambio Exacto, S.A., 166 F.3d 522, 526 (1st Cir. 1998) (holding that standing is a "threshold question in every federal case," including civil forfeiture actions).  Standing is both constitutional and statutory.  Constitutional standing "goes to the power of the court:  the question is whether the parties have presented the kind of case or controversy that the Constitution allows federal courts to hear."  Luitgaren v. Sun Life Assurance Co. of Canada, 765 F.3d 59, 62 (1st Cir. 2014) (citation omitted).  In contrast, statutory standing "relates to whether the plaintiff has a cause of action under a particular statute."  United States v. Catalá, 870 F.3d 6, 10 (1st Cir. 2017) (citation omitted); cf Katz v. Pershing, LLC, 806 F. Supp. 2d 452, 456 (D. Mass. 2011) ("Unlike a dismissal for lack of constitutional standing, which should be granted under Rule 12(b)(1), a dismissal for lack of prudential or statutory standing is properly granted under Rule 12(b)(6).") (citation omitted).  While constitutional standing is mandatory,

"statutory standing is not a perquisite to a court's power to adjudicate a case." Catalá, 870 F.3d at 10.

Constitutional standing requires an ownership or possessory interest in the seized property. United States v. One-Sixth Share of James J. Bulgerin All Present & Future Proceeds of Mass Millions Lottery Ticket No. M246233, 326 F.3d 36, 41 (1st Cir. 2013) (internal citation omitted). "[A]n allegation of ownership, coupled with some evidence of ownership, is sufficient to establish constitutional standing to contest a forfeiture." United States v. United States Currency, 189 F.3d 28, 35 (1st Cir. 1999) (citation omitted). Guiñazú, Foreign Exchange Bank, and José Manuel Guiñazú filed a claim of interest on November 13, 2019. Docket No. 24, Exs. 3—5 (E*Trade statements corresponding to the defendant property). Accordingly, the claimants have established constitutional standing. See United States v. $8,440,190.00 in U.S. Currency, 719 F.3d 49, 65 (1st Cir. 2013) ("At the pleading stage, standing is not difficult to establish.") (Howard, C.J.) (dissenting). At this juncture, the Court need not determine whether the claimants have statutory standing. Catalá, 870 F.3d at 10 (holding that "an inquiring court may opt, in the interest of efficiency, to forgo an inquiry into statutory standing and reject a claim on the merits") (citing First State Ins. Co. v. Nat'l Cas. Co., 781 F.3d 7, 10 n.2 (1st Cir. 2017).

### III. The Civil Asset Forfeiture Reform Act of 2000

Civil forfeiture is an *in rem* proceeding against real or personal property, litigated as "though [the object] were conscious instead of inanimate and insentient." Various Items of Personal Property v. United States, 282 U.S. 577, 581 (1931). This legal fiction emanates from pre-colonial common law, where the instrumentality "that caused the death of a human being – the ox that gored, the knife that stabbed, or the cart that crushed – was confiscated as a deodand." Charles Doyle, Cong. Research Serv., 97-139 at 4, Crime and Forfeiture (2015) (citation omitted). Modern forfeiture is a deterrent, "rendering illegal behavior unprofitable." Calero v. Pearson Yacht Leasing Co., 416 U.S. 663 687 (1974). The United States Code contains more than one hundred civil forfeiture statutes. William Carpenter, Reforming the Civil Drug Forfeiture Statutes: Analysis and Recommendations, 67 TEMP. L. REV. 1087, 1109 (1994). Because of this sprawling statutory landscape, "civil forfeiture is a creature unto itself." United States v. One 1987 Jeep Wrangler Auto, 972 F.2d 472, 476 (2d Cir. 1992).

Congress enacted the Civil Asset Forfeiture Reform Act in 2000 to "provide a more just and uniform procedure" for *in rem* proceedings. 106 P.L. 185 (2000); see 1 Moore's Federal Practice § 711.04 (noting that the various civil forfeiture statutes set

forth separate "procedural provisions, which can complicate" litigation). The statute requires the United States to "establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1); see, e.g., United States v. Approximately 600 Sacks of Green Coffee Beans, 381 F. Supp. 2d 57, 61 (D.P.R. 2005) (noting that "forfeiture of the beans was not granted until the Government showed by a preponderance of the evidence that the beans were contraband") (García, J.).

**A.   The Civil Forfeiture Causes of Action: 18 U.S.C. sections 981(a)(1)(A) and (a)(1)(C)**

Section 981 of CAFRA permits the United States to confiscate property derived from "virtually all serious federal crimes, and a number of state and foreign crimes as well." Stefan D. Cassella, The Civil Asset Forfeiture Reform Act of 2000: Expanded Government Forfeiture Authority and Strict Deadlines Imposed on All Parties, 27 J. Legis. 97, 111 (2001). The verified amended complaint sets forth five causes of action, alleging that the E*Trade accounts are the proceeds of, and served to, facilitate a fraudulent scheme to access Fedwire. (Docket No. 18.)

Counts one and two arise pursuant to 18 U.S.C. section 981(a)(1)(C). Id. This provision provides that "any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any specified unlawful activity

(as defined in section 1956(c)(7)) of this title)" is subject to civil forfeiture.   18 U.S.C § 981(a)(1)(C).   The United States maintains that the E*Trade accounts are traceable to wire fraud and conspiracy to commit wire fraud.   Docket No. 18 at pp. 16—18; see <u>United States v. Carpenter</u>, 941 F.3d 1, 7 (1st Cir. 2019) (noting that property derived from "mail or wire fraud is subject to forfeiture to the United States").

  Counts three through five are based on 18 U.S.C. section 981(a)(1)(A).   (Docket No. 18 at pp. 18-21.)   Pursuant to this provision, any property "involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title" is "subject to forfeiture to the United States."   18 U.S.C. § 981(a)(1)(A).   The United States avers that the E*Trade accounts were "involved in" money laundering and conspiracy to launder money, citing 18 U.S.C. sections 1956(h), 1956(a)(1)(B), and 1957. (Docket No. 18 at pp. 18-21.)   The money laundering counts impose an additional requirement on the United States.   CAFRA mandates that:

> [I]f the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense.

18 U.S.C. § 983(c)(3); <u>see</u> <u>United States v. $890,718.00</u>, 433 F.

Supp. 2d 635, 645-46 (M.D.N.C. 2006) (holding that the substantial

connection standard in section 983 requires more than "incidental

or fortuitous connection to criminal activity").

## IV. The Heightened Pleading Standard in Civil Forfeiture Actions

The Supplemental Rules for Certain Admiralty or Maritime

Claims and Asset Forfeiture Actions ("Supplemental Rules") govern

this proceeding.   <u>United States v. López-Burgos</u>, 435 F.3d 1, 2

(1st Cir. 2006); <u>see</u> Supp. R. Admin. or Mar. Cl. & Asset Forfeiture

Actions A ("Federal Rules of Civil Procedure also apply to [*in

rem*] proceedings except to the extent that they are inconsistent

with these Supplemental Rules.").   Supplemental Rule E(2)(a)

states that:

> the complaint shall state the circumstances from which
> the claim arises with such particularity that the
> defendant or claimant will be able, without moving for
> a more definite statement, to commence an investigation
> of the facts and to frame a responsive pleading.

Supp. R. Adm. or Mar. Cl. & Asset Forfeiture Actions E(2)(a).   This

pleading standard is higher than the "short and plain statement of

the claim" criteria set forth in Federal Rule of Civil Procedure 8.

<u>United States v. 49,000 Currency</u>, 330 F.3d 371, 375 n.8 (4th Cir.

2003) (holding that "within the context of civil forfeiture, the

Government must do more than simply provide greater detail than it

otherwise would be required to do under [the Federal Rules of Civil

Procedure]").  The Supplement Rules "fortif[y] the procedural due-process protections against improper use of [forfeiture] remedies."  12 Charles Allen Wright, <u>Federal Practice and Procedure</u> §3242 (2d ed. 1997).

Congress promulgated Supplemental Rule G(2)(f) in 2006, modifying the standard set forth in Supplemental Rule E(2)(a). Pursuant to Supplemental Rule G(2)(f), the United States must "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."  Supp. R. Admin. or Mar. Cl. & Asset Forfeiture Actions G(2)(f).  Supplemental Rule G(2)(f) "evolved" from Supplemental Rule E(2)(a), "[carrying] forfeiture case law forward without change."  <u>Id.</u> advisory committee's note on 2006 amendments. Accordingly, precedent predating the 2006 amendment remains relevant to the Court's analysis.  <u>See, e.g.</u>, <u>United States v. Eleven (11) New Util. Vehicles (Model: XXUTV800 – Monster Buggyl Mfr: Xingyue Group Co.)</u>, Case No. 13-1776, 2014 U.S. Dist. LEXIS 124712 at *30 (D.P.R. Sept. 4, 2014) (holding that the "facts alleged were sufficient to put potential claimants on notice of the United States' theory" pursuant to Rule E(2)(a)) (Gelpí, J.); <u>United States v. $465,789 Seized from Term Life Ins. Policy No. PJ 108002588</u>, 150 F. Supp. 3d 175, 177 (D. Conn. 2015) (citing Supplemental Rules E(2)(a) and G(2)(f)).  After establishing

standing to challenge the forfeiture, claimants may move to dismiss the *in rem* proceeding pursuant to Federal Rule of Civil Procedure 12(b) ("Rule 12(b)(6)").  Supp. R. Admin. or Mar. Cl. & Asset Forfeiture Actions G(8)(b)(i).

## V.   Federal Rule of Civil Procedure 12(b)(6) Standard

Pursuant to Rule 12(b)(6), defendants may move to dismiss an action for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  The Court is "obligated to view the facts of the complaint in the light most favorable to the [United States], and to resolve any ambiguities in [its] favor." Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 17 (1st Cir. 2011). The United States may not, however, "seize and continue to hold property upon conclusory allegations that the defendant property is forfeitable."  United States v. 1,399,313.74 in United States Currency, 591 F. Supp. 2d 365, 369 (S.D.N.Y 2008).  To determine whether a complaint complies with Supplemental Rules G(2)(f) and E(2)(a), courts "look to the totality of the evidence."  United States v. Funds in the Amount of Thirty-Thousand Six Hundred Seventy Dollars, 403 F.3d 448, 455 (7th Cir. 2005); United States v. $12,480 in United States Currency, 510 F. Supp. 2d 167, 172 (D. Mass. 2007) (dismissing civil forfeiture action based on the totality of the circumstances).

## VI.  The Underlying Criminal Violations

Civil forfeiture is contingent on the premise that Guiñazú and Shuford violated predicate criminal statutes, *i.e.* money laundering and wire fraud.  The claimants' motion to dismiss is structured as a hypothetical syllogism: to state a claim for civil forfeiture, the United States must allege the commission of a predicate criminal offense; the United States fails to allege a predicate criminal offense; thus, plaintiff fails to state a civil forfeiture cause of action.  (Docket No. 28.)

### A.  Money Laundering Counts

Counts three, four and five of the verified amended complaint are based on the Money Laundering Control Act of 1986, a statue enacted "to detect and punish financial transactions representing the proceeds of . . . unlawful activity."  United States v. Aversa, 984 F.2d 493, 505 (1st Cir. 1993); 18 U.S.C. §§ 1956 and 1957.  Money laundering is "the process by which criminals – and, most notably, drug dealers – disguise the origin of money obtained illegally from activities such as drug dealing, prostitution, investment fraud, gambling, or racketeering."  United States v. Lineberry, 702 F.3d 210, 219 (5th Cir. 2012) (citation omitted).

Section 1956(a)(1)(B) concerns the concealment or failure to report "property involved in a financial transaction

[representing] the proceeds of some form of unlawful activity."
18 U.S.C. § 1956(a)(1)(B).   Section 1957 prohibits individuals
from "knowingly [engaging] or [attempting] to engage in a monetary
transaction in criminally derived property that is of a value
greater than $10,000 and is derived from specified unlawful
activity."  18 U.S.C. § 1957.  Lastly, section 1956(h) pertains to
"[a]ny one who conspires to commit" a money laundering offense.
18 U.S.C. § 1956(h).  Accordingly, the United states must allege
the commission of an "unlawful activity" to substantiate the money
laundering causes of action.   See United States v. Burgos, 254
F.3d 8, 14 (1st Cir. 2001) ("Therefore, to convict Burgos of money
laundering, the government had to prove that he attempted to
distribute cocaine to satisfy the specified 'unlawful activity'
element of the crime."); United States v. Cruzado-Laureano, 440
F.3d 44, 46 (1st Cir. 2006) ("Money laundering is, generally
speaking, a derivative offense: money needs to be laundered because
it was illegally derived.")  Like the civil forfeiture claim, money
laundering requires a derivative offense.   In this case, the
derivative offense is wire fraud.

**B.   Wire Fraud:  The "Specified Unlawful Activity" in the
Money Laundering Counts**

The "classic money laundering case involves a drug
trafficker acting with the complicity of a banker [to deposit drug

proceeds at a financial institution] under the guise of a legitimate business transaction." United States v. Castellini, 392 F.3d 35, 48 (1st Cir. 2004) (citation omitted). The verified amended complaint insinuates that the defendant properties stem from an unspecified criminal venture, predating the alleged wire fraud. (Docket No. 18.) For instance, the United States alleges that: (1) Guiñazú transferred funds "on behalf of customers located in high-risk money laundering jurisdictions in Central and South America," (2) "MCS operated out of a studio apartment in the U.S. Virgin Islands," and (3) "[s]ome of MCS's clients were foreign money service businesses owned by and affiliated with other members of [his] family." Id. at pp. 2 and 9.

The verified amended complaint is devoid of explicit drug trafficking allegations, however, predicating the money laundering counts on the wire fraud allegations. Docket No. 34 at p. 18; see Carpenter, 941 F.3d at 6 n.3 ("Specified unlawful activity under § 1956(c)(7) includes "any act or activity constituting an offense listed in section 1961(1) of this title, which includes mail and wire fraud."). The following recitation conveys the United States' theory of the case.

Clients from Latin America remitted funds to the MCS and Foreign Exchange Bank accounts in the U.S. Virgin Islands and Puerto Rico. (Docket No. 18.) Guiñazú and Shuford allegedly

committed wire fraud in September of 2016 by submitting false
information to Cooperative A, a financial institution with a master
account at a Federal Reserve Bank and access to Fedwire. (Docket
No. 18 at p. 7.) This false information induced Cooperative A to
"open a correspondent account for MCS." Id. at pp. 7—8. MCS
transferred client funds from the Cooperative A account, now
tainted by the commission of wire fraud, to various recipients *via*
Fedwire. Id. at p. 9.

Resolution of the Rule 12(b)(6) motion is contingent on
the adequacy of the substantive wire fraud allegations (counts one
and two), and the money laundering allegations for which wire fraud
is the predicate offense (counts three through five). See United
States v. Seward, 272 F.3d 831, 836 (7th Cir. 2001) ("The
transaction or transactions that created the criminally derived
proceeds must be distinct from the money-laundering transaction,
because money laundering statutes criminalize 'transactions in
proceeds, not the transactions that create the proceeds.")
(internal citation and quotation omitted).

To sustain a wire fraud cause of action, the verified
amended complaint must allege: "(1) a scheme to defraud,
(2) knowing and willful participation in the scheme with the intent
to defraud; and (3) the use of interstate or foreign wire
communications to further that scheme." United States v. McLellan,

959 F.3d 442, 469 (1st Cir. 2020) (citation omitted); 18 U.S.C. § 1343.  An essential element of wire fraud is the attainment of money or property.  United States v. McNally, 483 U.S. 350, 360 (1987) ("[W]e read [the mail fraud statute] as limited in scope to the protection of property rights."); Kelly v. United States, 140 S. Ct. 1565, 1569 (2020) (vacating a wire fraud conviction in part because "the realignment of the toll lanes was an exercise of regulatory power – something that this Court has already held fails to meet the statute's property requirement").[9]

The claimants present a tripartite challenge to the verified amended complaint.  First, claimants contend that the purported wire fraud "did not result in any financial gain from the victim."  (Docket No. 28 at p. 14.)  According to the claimants, neither Guiñazú and Shuford "committed a scheme to defraud because there is not even a single allegation that the misrepresentations were directed at its clientele" or any financial institution.  Id. at pp. 14—15.  Second, without a predicate offense (i.e. wire fraud or drug trafficking), the money laundering allegations are

---

[9] Because wire fraud and mail fraud "share the same language in relevant part, [courts] apply the same analysis to both sets of offenses."  United State v. Carpenter, 484 U.S. 19, 25 n.6 (1987); United States v. Tum, 707 F.3d 68, 75 (1st Cir. 2013) (holding that the "elements of [mail fraud] mirror the wire-fraud statute in relevant respects, so cases dealing with one statute are helpful with dealing with the other").  Moreover, "case law interpreting [mail and wire fraud] should be used to interpret [bank fraud]."  United States v. Steffen, 687 F.3d 1104, 1109 n.3 (8th Cir. 2012); United States v. Doherty, 969 F.2d 425, 429 (7th Cir. 1992) (holding that "'scheme to defraud' means the same thing under §§ 1341, 1343 and 1344").

deficient.  Id. at pp. 16—17.   Third, the CAFRA claims are *a fortiori* invalid because the verified amended complaint allegedly fails to set forth an underlying criminal violation.

## C.   **The Right to Control as a Property Interest**

Guiñazú, Foreign Exchange Bank, and José Manuel Guiñazú argue that the "alleged misrepresentations did not result in any financial gain from a victim." (Docket No. 28 at p. 13.)   The United States maintains, however, that "(f)inancial institutions have the valuable right and interest in controlling the products and services they offer and to regulate their customers' use of those products and services." (Docket No. 34 at pp. 9—10.)   The dispositive inquiry is whether the right to control access to Fedwire is a cognizable property interest for purposes of establishing wire fraud.

The wire fraud statute protects tangible and intangible property.  Carpenter v. United States, 484 U.S. 19, 25 (1987) (holding that "the intangible nature of [confidential business information] does not make it any less 'property' protected by the mail and wire fraud statutes").   Not all intangible property, however, falls within the purview of wire fraud.  See, e.g., Cleveland v. United States, 531 U.S. 12, 26-27 (2000) (holding that a "Louisiana video poker license in the State's hands is not 'property' under § 1341").  "Property" is traditionally defined as

a "bundle of rights," including the "right to possess and use, the right to exclude, and the right to transfer." Black's Law Dictionary, at 1410 (10th ed. 2014); see United States v. Bucuvalas, 970 F.2d 937, 945 (1st Cir. 1992) ("In the broadest sense, a 'property' interest resides in the holder of any of the elements comprising the 'bundle of rights' essential to the use or disposition of tangible property or to the exercise or alienation of an intangible right") (citation omitted).[10]  Exclusivity is "one of the most essential sticks in the bundle of rights." College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense. Bd., 527 U.S. 666, 672 (1999).

---

[10]  In Bucuvalas, the First Circuit Court of Appeals held that the City of Boston's right to issue liquor and entertainment licenses constituted property within the meaning of the federal fraud statutes.  970 F.2d at 945. Subsequently, the Supreme Court adopted a divergent position, holding that "state and municipal licenses in general . . . do not rank as 'property' for purposes of [mail fraud], in the hands of the office licensor." Cleveland, 531 U.S. at 15. The Cleveland court emphasized that a government issued license is "purely regulatory" and "cannot be economic."  Cleveland, 531 U.S. at 357. The fraud in Cleveland implicated "the Government's role as a sovereign, not as a property holder." Id. at 24.   Here, the putative victim is a private institution, not a governmental entity.  Accordingly, the regulatory interests central to the Supreme Court's analysis in Cleveland are absent from this case. See In re. Ranbaxy Generic Drug Application Antitrust Litig., Case No. 19-2878, 2019 U.S. Dist. LEXIS 205849 *32 (D. Mass. Nov. 27, 2019) (holding that Cleveland is distinguishable because the "plaintiffs have alleged that Ranbaxy's fraud affected the interests of individuals and entities other than the government").

Courts have placed the "right to control" within the scope of the federal fraud statutes.[11]   In _United States v. Kerchian_, the Seventh Circuit Court of Appeals determined whether the "right to ensure that [machineguns] were sold in compliance with federal law" is "property" for purposes of the mail and wire fraud statutes.  937 F.3d 895 (7th Cir. 2019).  The defendants in _Kerchian_ paid full price for federally regulated firearms, but falsely represented that the machineguns were purchased by a Sheriff's Department.  _Id._ at p. 901.  Although the arms dealer in _Kerchian_ received payment for the machineguns, "by illegally selling the firearms it opened itself up to risks it did not bargain for: risks of liability, of increased government scrutiny, and negative publicity, all of which in turn could jeopardize future sales."  _Id._ at 913.

Deprivation of the right to control "does not render every transaction induced by deceit actionable under the mail and wire fraud statutes."  _Id._ at 912 (citation omitted).  There is a

---

[11] _See_ _United States v. Carlo_, 507 F.3d 799, 802 (2d Cir. 2007) ("By causing the developers to make economic decisions about the validity of their real estate projects based on misleading information, Carlo harmed the developers' property interests."); _United States v. Gray_, 405 F.3d 227, 234 (4th Cir. 2005) (affirming wire fraud conviction, holding that a "property owner has an intangible right to control the disposition of its assets"); _United States v. Treadwell_, 593 F.3d 990, 999 (9th Cir. 2010 ) (affirming wire fraud conviction because defendants, "through misrepresentation, intentionally deprived their victims of the opportunity to decide for themselves, on the basis of true and accurate information, whether or not to invest in companies"); _United States v. Welch_, 327 F.3d 1081, 1108 (10th Cir. 2003) ("The Tenth Circuit Court of Appeals has] recognized the intangible right to control one's property is a property interest within the purview of the mail and wire fraud statutes").

"fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid – which do not violate the mail or wire fraud statutes – and schemes that depend for their completion on a misrepresentation of an essential element of the bargain – which do violate the mail and wire fraud statutes." Id.; compare United States v. Shellef, 507 F.3d 82, 108 (2d Cir. 2007) (dismissing the indictment because the jury might erroneously convict the defendants for "simple fraudulent inducements to gain access to [industrial chemicals]") with United States v. Schwartz, 924 F.2d 410, 421 (2d Cir. 1991) (affirming wire fraud conviction where a vendor "sold its products to appellants only because of their deceit and misrepresentations, which were offered as consideration for [the vendor] to contract with them").

Like the right to control access to firearms in Kelerchian, the right to control access to Fedwire constitutes "property" in the context of wire fraud. Cooperative A is "regulated by the Public Corporation for Supervision and Insurance of Cooperatives of Puerto Rico ("COSSEC"), which requires [it] to

comply with the [Bank Secrecy Act]." (Docket No. 18 at p. 6.)[12]
The false statements that Guiñazú made to Cooperative A pertain to
mandatory BSA and anti-money laundering obligations. Id. at pp. 6—
7. Just as the illegal sale of machineguns exposed the arms dealer
in Kelerchian to a litany of criminal and financial risks, failure
to ensure compliance with the BSA posed similar threats to
Cooperative A. Violations of the BSA may result in criminal
prosecution, including monetary fines and imprisonment. See 31
U.S.C. § 5322. Foreseeable consequences of a criminal
investigation include the loss of good will and future business
opportunities. A reasonable inference, based on these
circumstances, is that Cooperative A would refuse to open an
account for clients who flout federal law. See Docket No. 18 at
p. 8. By wielding the authority to approve or reject an account
application, Cooperative A controlled access to Fedwire. Indeed,
Cooperative A paid a fee to "send and receive payments" *via*
Fedwire, a service available only to master account holders. The
discretion to exclude others from utilizing this service

---

[12] COSSEC, known in Spanish as the Corporación Pública para la Supervisión y
Seguro de Cooperativas de Puerto Rico, is responsible for the "monitoring and
total supervision of cooperative savings and credit unions and their
operations." P.R. Laws Ann. tit. 7, § 1334. Pursuant to Puerto Rico law, every
cooperative shall comply with "local and federal regulations applicable to their
businesses, services and operations." Id. at § 1334i.

underscores that the right to control access to Fedwire is a cognizable property interest.

### 1.   First Circuit Precedent

In <u>United States v. Kenrick</u>, the First Circuit Court of Appeals addressed the "'right to control' theory" in a criminal bank fraud action.  Case No. 98-1282, 2000 U.S. App. LEXIS 2594 *38.  A bank president concealed his interest in several properties from the board of directors, the entity responsible for ratifying and approving bank issued loans.  In the same vein as <u>Kelerchian</u>, the <u>Kenrick</u> court held that "bank fraud does not mean that any falsehood told to a bank, or any breach of fiduciary duty by a bank official with an undisclosed conflict of interest, constitutes a deprivation of the bank's right to control its assets."  <u>Id.</u> at *38.  The First Circuit Court of Appeals relied on <u>United States v. Neder</u>, specifying that a matter is material if:

> (a) a reasonable man would attach importance to its existence or non-existence in determining his choice of action in the transaction in question; or
>
> (b)  the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it.

<u>Id.</u> (citing 527 U.S. 1, 22 n.5 (1999)).  The <u>Kenrick</u> court affirmed the bank fraud convictions because "the evidence showed that the

[defendant] deprived [the bank] of its right to control the disposition of its property, not only by concealing material information necessary to make an informed lending decision, but also by preventing it from making any lending decision at all by taking the loan without Board approval (and then falsifying bank records to conceal this fact)." Id. at *48.[13]

The falsehoods perpetuated by Guiñazú and Shuford persuaded Cooperative A to open an account for MCS, an allegation that encapsulates the "materiality" element of wire fraud. According to the United States, the wire fraud commenced when:

> Cooperative A . . . asked MCS to provide its [Bank
> Secrecy Act and Anti-Money Laundering] compliance
> policies. Guiñazú emailed Cooperative A MCS's BSA/AML
> Policies and Procedures (the "Compliance Manual"), which
> also contained false statements, including falsely
> identifying Person #1 as MCS's Chief Compliance Officer.
> The Compliance Manual also displayed Person #1's digital
> signature, which Person #1 did not authorize Guiñazú to
> use. Cooperative A, relying on the false, inaccurate,
> and misleading statements and information that Guiñazú
> provided, opened a correspondent account for MCS. Both
> Shuford and Guiñazú appear to have signed the account-
> opening documents.

(Docket No. 18 at p. 8.) Just as the bank president in Kenrick concealed a potential conflict of interest, Guiñazú and Shuford withheld truthful and accurate information from Cooperative A.

---

[13] Sitting *en banc*, the First Circuit Court of Appeals subsequently affirmed the bank fraud convictions for a second time. United States v. Kenrick, 221 F.3d 19 (2000) (abrogated on other grounds by Loughrin v. United States, 573 U.S. 351 (2014)).

That the bank president acquired a loan, while Guiñazú and Shuford obtained access to Fedwire is insignificant.    Fedwire is an exclusive service, a benefit offered to clients at the discretion of Cooperative A.  This assessment is equally applicable to a bank loan.

Ultimately, the right to control access to Fedwire is "property" for purposes of the wire fraud statute.  (Docket No. 28.)   This broad interpretation of "property" comports with federal wire and mail fraud jurisprudence.   See United States v. Sidoo, Case No. 19-1008, 2020 U.S. Dist. Lexis 110148 (D. Mass. June 23, 2020) ("This Court holds that application slots to universities are property interests owned by the university cognizable under the mail and wire fraud statutes.").[14]  Because the United States has stated "sufficiently detailed facts to support a reasonable belief that the government will be able to

---

[14] See also United States v. Billmyer, Case No. 94-029, 1995 U.S. Dist. LEXIS 385 *20 (D.N.H. Jan. 5, 1995) (holding that a car dealership "had a property right or interest in awarding Letters of Intent" pursuant to the federal fraud statutes); United States v. Theodore, Case No. 87-301, 1999 U.S. Dist. LEXIS 16830 at *10 (D. Mass. Oct. 21, 1999) ("By causing the fraudulent issuance of a medical license, Petitioner deprived the Commonwealth of this authority and control, and thus of a property right."); United States v. Sorich, 523 F.3d 702, 713 (7th Cir. 2008) (holding that "jobs are property for purposes of mail fraud, and that the indictment sufficiently alleged a deprivation of property"); United States v. Kernell, Case No. 08-142, 2010 U.S. Dist. LEXIS 36477 *9 (E.D. Tenn. Mar. 17, 2010) (holding that "information data and pictures in Governor Palin's email account" qualified as "property" pursuant to the mail and wire fraud statutes); United States v. Titlayo Akintomide Akinyoyenu, 201 F. Supp. 3d 82, 86 (D.D.C. 2016) (noting that "it is well recognized that prosecutors may charge a 'right to control' theory of mail (and wire) fraud") (citing cases).

meet its burden of proof at trial," the claimant's motion to dismiss is **DENIED**.  Supp. R. Admin. or Mar. Cl. & Asset Forfeiture Actions G(2)(f).

## VII. Intent to Defraud

Guiñazú, Foreign Exchange Bank, and José Manuel Guiñazú contend that the verified amended complaint fails to allege "specific intent to defraud any financial institutions." (Docket No. 28 at p. 15.)  The intent to defraud "may be established by circumstantial evidence and examination of the scheme itself." United States v. Hoen Seok Lee, 937 F.3d 797, 811 (7th Cir. 2019). Whether or not Guiñazú and Shuford possessed the requisite intent to defraud is a question of fact for the jury to decide.  See United States v. Reaume, 338 F.3d 577, 583 (6th Cir. 2003).  The verified complaint "contains enough information that [the claimants] can understand the theory of forfeiture, begin an investigation, and file a response."  United States v. $49,400 in United States Currency at Logan Airport, Case No. 18-12233, 2019 U.S. Dist. LEXIS 45002 at *7 (D. Mass. Mar. 19, 2019). Consequently, the lack of intent argument is unpersuasive.

## VIII. Traceability

The claimants assert that the United States failed to allege that "there is a substantial connection between the property sought to be forfeited and any unlawful activity, as required by [section

983] of CAFRA." (Docket No. 28 at p. 23.) The United States avers, however, that Guiñazú "transferred the illicit proceeds from the MCS Operational Account [at Cooperative A] to accounts in the name of MCS that he established at E*Trade." (Docket No. 18 at p. 11.) The Cooperative A account allegedly contained the "illicit proceeds of wire fraud in violation of 18 U.S.C. §§ 1343 and 1349." Id. at p. 10.

A motion to dismiss challenges the sufficiency of the pleadings, not "proof at trial." United States v. All Funds on Deposit in Dime Sav. Bank of Williamsburg Account, 255 F. Supp. 2d 56, 68 (E.D.N.Y. 2003) ("[T]he court need not pass on the government's ultimate burden of proof regarding traceability. The only question [presented by a motion to dismiss] is whether the proposed Amended Complaint describes sufficiently 'the circumstances from which the claims arise.'"). The United States "is not required to demonstrate full tracing of all account activity to prove money laundering," because "the pleading standard for tracing funds in a civil forfeiture complaint is not exacting." United States v. All Assets Held in Account No. 80020796, 83 F. Supp. 3d 360, 314 (D.D.C. 2015). Accordingly, the verified amended complaint sufficiently places claimants on notice that the E*Trade accounts are traceable to the Cooperative A account.

## IX.  **The Excessive Fines Clause of the Eighth Amendment**

The final argument set forth in support of the motion to dismiss pertains to the Eighth Amendment of the United States Constitution, which provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." Docket No. 28 at pp. 25—27 (citing U.S. Const. amend. VIII). According to the claimants, "the attempted forfeiture of over five million dollars is grossly disproportional to the gravity of the alleged offense." Id. at p. 21. Pursuant to Supplemental Rule G(8)(e), the claimants:

> may seek to mitigate a forfeiture action under the Excessive Fines Clause of the Eighth Amendment by motion for summary judgment or after entry of a forfeiture judgment if:
>
> (i)     the claimant has pleaded the defense under Rule 8; and
>
> (ii)    the parties have had the opportunity to conduct civil discovery on the defense.

Supp. R. Admin. or Mar. Cl. & Asset Forfeiture Actions G(8)(e). Pursuant to Supplemental Rule G(8)(e), the claimants' Eighth Amendment claim is "premature." United States v. $22,361.83 United States Funds Seized from Various Accounts, Case No. 11-317, 2012 U.S. Dist. LEXIS 72166 at *10 (E.D. Wash. May 23, 2012) (holding that the "Court must make [the excessive fine] determination after determining whether forfeiture of the seized assets is

appropriate"); see <u>United States v. 424 Main St.</u>, 862 F. Supp. 2d 24, 35—36 (D. Mass. 2012) ("Because the facts relating to proportionality have yet to be developed, it would not be appropriate for this court to resolve the Claimant's Eighth Amendment claim at this time.").

## X.  Conclusion

For the reasons set forth above, the Guiñazú, Foreign Exchange Bank, and José Manuel Guiñazú's motion to dismiss is **DENIED**. (Docket No. 28.)

**IT IS SO ORDERED.**

San Juan, Puerto Rico, July 9, 2020.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE